UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
QULING CAO,

                    Plaintiff,

-against-

JOE ZHENGHONG ZHOU, LAW OFFICES OF
JOE ZHENGHONG ZHOU AND ASSOCIATES, PLLC,
NYC METRO REGIONAL CENTER LLC and
NYC FUND LP,

                    Defendants.
----------------------------------------x

**COMPLAINT**

**CIVIL ACTION NO.
16 Civ. 6558**

**JURY TRIAL DEMANDED**

    Plaintiff, Quling Cao, by her attorneys, Moss & Kalish, PLLC, complaining of the defendants, alleges as follows:

### Nature of Action

    1. This lawsuit arises out of fraudulent conduct by defendants in inducing plaintiff to invest at least $545,000, and to retain the first two named defendants to provide legal services, into a business pursuant to the United States EB-5 Immigrant Investor Program with the promise of obtaining an immigration visa for her son, herself and her husband. Plaintiff brings this claim for, inter alia, legal malpractice and fraud and seeks money damages and rescission with respect to her investment.

### Parties

2.  Plaintiff, Quling Cao ("Cao") is a natural person residing in and a citizen of the People's Republic of China ("China"). Cao resides in Guangzhou, China.

3. Upon information and belief, defendant, Joe Zhenghong Zhou, is a natural person residing in the State of New York, County of Queens.

4. Upon information and belief, Zhou is duly licensed to practice law in the State of New York and maintains an office for the practice of law in Flushing, New York.

5. Upon information and belief, defendant Law Offices of Joe Zhenghong Zhou and Associates, PLLC ("Associates") is a professional limited liability company duly organized and existing under the laws of the State of New York.

6. Associates is engaged in the practice of law.

7. Zhou practices law through Associates.

8. Zhou and Associates are referred to collectively herein as Associates. Unless otherwise set forth herein, "Zhou" shall refer to Zhou individually.

9. Upon information and belief, NYC Metro Regional Center LLC ("NYC Metro") is a limited liability company duly organized and existing under the laws of the State of New York, with a principal place of business in the State of New York, County of Queens.

10. Upon information and belief, NYC Fund LP ("NYC Fund"), is a limited partnership duly organized and existing under the laws of the State of New York, with a principal place of business in the State of New York, County of Queens.

11. NYC Fund and NYC Metro share offices with Associates at 136-20 38th Avenue Ste. 10-H, Flushing, New York 11354.

### Jurisdiction and Venue

12. This Court has subject matter jurisdiction over this action pursuant to: a) 28 U.S.C. §1332(a)(2) as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and a citizen or subject of a foreign state; and b) 28 U.S.C. 1331, as it arises under the federal securities laws and has supplemental jurisdiction over plaintiff's state law claims because the form part of the same case or controversy as the federal law claims.

13. Venue is proper with respect to this action in the Eastern District of New York pursuant to 28 U.S.C. §1391(b)(1).

### Factual Background

14. Congress created the EB-5 program in 1990 to stimulate the United States economy through job creation and capital investment by foreign investors. In 1992, Congress created the Immigrant Investor Program, also known as the "Regional Center Program." This sets aside EB-5 visas for participants who invest in commercial enterprises associated with reginal centers

3

approved by the United State Customs and Immigration Service ("USCIS") based on proposals for promoting economic growth. In order to qualify for an EB-5 visa, a foreign applicant must invest $500,000 or $1 million (depending on the type of investment) in a commercial enterprise approved by USCIS. Once the foreign applicant has made the investment, he or she may apply for conditional permanent resident status (a/k/a temporary green card) a conditional green card, which is good for two years. If the investment creates or preserves at least ten jobs during those two years, the foreign applicant may apply to have the conditions removed from his or her green card. The applicant can then live and work in the U.S. permanently.

15. Under certain circumstances, children of foreign nationals who receive EB-5 visas and who are under age 21 at all prescribed periods can qualify for permanent residence status based on a parent's EB-5 visa.

16. Plaintiff, a Chinese national, developed an interest in obtaining authorization to live and work in the United States on a permanent basis in the United States. This authorization is commonly known as a green card.

17. Plaintiff's interest in obtaining a green card was precipitated by her interest in helping her son, Jinhuai Wang ("Wang"), to obtain a green card allowing him to study, live and work in the United States. In other words, plaintiff wanted to

4

obtain the green card for the purpose of using it to enable her son to obtain a green card.

18.  Wang was born on February 18, 1994.

19. In 1992, Congress created the Immigrant Investor Program, also known as the Regional Center Program. The Regional Center Program sets aside EB-5 visas for participants who invest in commercial enterprises associated with regional centers approved by the United States Customs and Immigration Service ("USCIS") based on proposals for promoting economic growth. In other words, the investments are typically administered by regional centers throughout the United States. The investments are typically made in limited partnerships or limited liability companies whose investments satisfy certain criteria and result in the creation or preservation of United States jobs. To qualify for the program, the foreign investors must invest $1 million ($500,000 if in a rural area or area of high unemployment) and thereby create at least ten full-time jobs for United States workers.

20. NYC Metro has been duly authorized by USCIS as a regional center. Consequently, investors in a commercial enterprise associated with NYC Metro may be eligible for an EB-5 visa and, ultimately, a temporary green card and a permanent green card.

21. Upon information and belief, NYC Metro formed NYC fund on or about November 12, 2010 by filing a Certificate of Limited Partnership with the New York Secretary of State.

22. Upon information and belief, NYC Metro is the managing general partner of NYC Metro and the only general partner of NYC Fund.

23. NYC Metro and NYC Fund are based at Zhou's law office.

24. Zhou is the President of NYC Metro.

25. Upon information and belief, Zhou is the managing member, if not the sole member, of NYC Metro.

26. As the President of NYC Metro, which is in turn the managing general partner of NYC Fund, Zhou controls the affairs of NYC Fund.

27. The limited partnership agreement of NYC Fund, which is signed by Zhou, provides at Section 1.01 thereof, that NYC Fund was formed to extend a construction loan to an owner-developer of real property, and to obtain a security interest in certain real property, located in Long Island City, Queens.

28. The partnership agreement further provides that the ultimate goal of the financing and construction involved the ownership, construction, design and development of a Crowne Plaza Hotel and an Indigo Hotel in Long Island City (the "Hotel Project").

29. Pursuant to a Private Placement Memorandum issued in connection with the Hotel Project, the hotels was to be developed on adjacent properties located at 25-10 42nd Road and 42-59 Crescent Street in Long Island City.

30. NYC Metro agreed to provide loan financing for the Hotel Project through its affiliate, NYC Fund.

31. NYC Metro has been designated and approved by USCIS as a Regional Center under the EB-5 program.

32. Ultimately, funds for the Hotel Project would be raised from EB-5 investors, all of whom would be foreign investors.

33. The EB-5 investors would in turn acquire limited partnership interests in NYC Fund, with each such partnership interest intended to be a Qualifying Investment under the EB-5 program.

34. Pursuant to page 31 of the Private Placement Memorandum (the "PPM") for the Hotel Project, the maximum number of limited partnership units that can sold with respect to the Hotel Project is 89, at a per unit price of $500,000, for a total aggregate offering of $44,500,000.

35. Cao learned of the existence of the EB-5 program as a way for her son, Wang, herself and her husband to obtain EB-5 visas and, ultimately, green cards.

36. In or around May, 2012, Zhou traveled to Beijing, China. Zhou met with Cao and her brother, Yongning Cao ("Yongning").

37. At this meeting, Zhou described the EB-5 program. He explained that he was an attorney in New York. Zhou explained that he had an expertise in immigration law.

38. Zhou explained that he could represent Cao with respect to all steps necessary for her to file an EB-5 Immigrant Petition that would be associated with the Hotel Project. These steps included filing an I-526 petition with USCIS.

39. Zhou also explained that Associates represented Metro Center, the general partner of NYC Fund.

40. Cao and Yongning explained to Zhou that Cao's interest in the EB-5 program was primarily driven by her interest in obtaining an EB-5 visa, and ultimately, permanent resident status and a Green Card for her son, Wang, not herself or her husband.

41. Cao and Yongning further explained that Wang was born on February 18, 1994.

42. Cao was greatly concerned about whether Wang would become too old, i.e. "age out" of the EB-5 program.

43. Zhou explained repeatedly and emphatically that he was an expert in United States immigration law and that there would

be no problem with getting an EB-5 visa and, ultimately, a Green Card for Wang.

44. Zhou explained the Hotel Project to Cao and her brother.

45. Zhou explained that in addition to acting as the lawyer for Cao and her son, he would be the attorney for NYC Metro.

46. Zhou explained that Cao would have to invest $500,000 for her partnership interest in NYC Fund, as well as a $30,000 syndication fee.

47. According to the Offering Circular issued by NYC Fund, the syndication fee will be received by "[t]he Managing General Partner", who will also receive "reimbursement of expenses incurred in connection with this Offering Circular."

48. In other words, the syndication fee of $30,000 that Cao would be charged was to go into Zhou's pocket.

49. In or around January, 2013, following Zhou's meeting in China with Cao and Yongning, Cao sent her son, Wang, to high school in the United States. Wang began to attend school in Westchester County, New York.

50. Also subsequent to Zhong's meeting in China with Cao and Yongning, Cao received marketing and other materials in the Chinese (Mandarin dialect) from Zhou, and continued discussions with Zhou about the Hotel Project.

51. In addition to receiving green cards for herself, her husband and in particular her son, Cao was also interested in receiving a reasonable return on her investment in the Hotel Project.

52. The Chinese language documents stated at Slide 21 thereof, in part, the following:

i.  the "total investment" was $76,700,000;

ii. the EB-5 loan was $44,500,000;

iii. the EB-5 loan is the first mortgage loan and only loan for the project.

iv. the EB-5 loan secured by the land, improvement, fixtures and income from the hotels.

v. remaining financing for the project in the amount $32,200,000 consists of the developer's own funds and other financing.

53. The Chinese language materials provide, at Slide 23 thereof, in part as follows:

i. the funds from the EB-5 investors will be the first loan and only loan to Crowne Plaza;

ii. The EB-5 fund will also be secured by a pledge of overall equity in the Indigo Hotel. EB-5 investors are the primary and only beneficiary to the pledge of equity. Thus, the EB-5 fund is secured by "dual mortgages."

iii. The construction guarantee for the project provides guarantee for timely completion.

54. The Chinese language materials provide, at Slide 29 thereof, in part as follows:

i. Green Card Guarantee

The project already prepared to start.

ii. The project has Completion Guarantee, which ensures the project to be conducted with schedules.

55. The Chinese language materials provide, at Slide 30 thereof, in part as follows:

i. EB-5 Investor is the first lien holder and the only loan to the Crowne Plaza.

ii. EB-5 fund is also secured by a pledge of overall equity in Indigo Hotel. EB-5 investor is the only beneficiary to the pledge of equity. Therefore, EB-5 fund has "dual" guarantee.

56. Following her meeting with Zhou, Cao received a retainer agreement from Associates.

57. The retainer agreement provided that Cao would be hiring Associates "to provide legal services in connection with your EB-5 Immigrant Petition associated with NYC Metro Reginal Center, LLC and its affiliated… under the EB-5 Immigrant Investor Pilot Program including … Immigrant Petition (I-526), Consular Processing (DS-230) or Adjustment of status (I-485), and Removal of Conditions (I-829) only."

58. The retainer agreement further provided that Associates' services would:

> [I]nclude, but are not limited to, ….. filing on your behalf (1) a form I-526 Immigrant Petition as an Alien Entrepreneur, (2) a Form I-485 to adjust status to conditional permanent resident, or, in the case that you reside outside of the United States, a DS-230 form, Application for Immigrant Visa and Alien Registration, with the U.S. Consulate General to obtain an EB-5 immigrant visa for admission to the United States, and (3) a Form I-829 to remove the conditions on your residence. We shall provide those legal services reasonably required to represent you and shall take reasonable steps to keep you informed of progress and to respond to your inquiries.

59. The retainer agreement provided that Cao would pay an upfront retainer of $10,000, plus numerous other fees, costs and expenses and a second installment of $5,000 upon approval of her I-526 petition. The additional fees included filing fees as well as for disbursements such as long distance phone calls, translations, parking, etc.

60. The retainer agreement provides, at paragraph 4(1), that Associates represents NYC Metro and that NYC Metro is to be the general partner "of the new commercial enterprise into which you will place your investment capital, in certain legal matters pertaining to the EB-5 Immigrant Investor Program [i.e. NYC Fund]."

61. The retainer agreement did not state that Zhou was the President of NYC Metro.

62. The retainer agreement did not state that NYC Metro, the entity of which Zhou was President, would receive the following fees and compensation:

i. $30,000 "Administrative" or "Processing" fee that Zhou, as an investor in NYC Fund would be required to pay;

ii. One percent fee of the full amount of the loan made by NYC Fund for the Project;

iii. Annual fee of up to one percent per annum on the amount of the loan;

iv. The spread between the interest charged on the Partnership Loan and the Preferred Return paid to the Investors by the Partnership; and

v. Three percent of the outstanding principal amount of the loan contributed by EB-5 investors, up to a maximum of 20 total EB-5 investors.

63. Cao signed the Retainer Agreement.

64. Cao paid the initial retainer fee of $10,000 and several other fees, including:

i. $10,000 documentation managing fee;

ii. $10,000 documents translation fee;

iii. $600 escrow service fee; and

iv. $50 express mail and $50 incoming wire fee.

65. Cao paid the fee of $5,000 in connection with the approval of her I-526 petition.

66. Cao executed the Subscription Agreement on February 1, 2014.

67. To date, notwithstanding the "guarantees" provided for in the Chinese language documents, no construction activity has taken place with respect to the Hotel Project.

### AS AND FOR A FIRST CAUSE OF ACTION

68. Plaintiff repeats and realleges paragraphs 1 through 67 hereof as if more fully set forth herein.

69. Zhou, and through him Associates, filed an I-526 petition for Cao on April 13, 2014.

70. On or about June 8, 2015, USCIS approved the I-526 petition.

71. This meant that Cao could apply for consular processing at the United States embassy in China in order to obtain an immigrant visa. Cao would have to submit the two part Form DS-230, an Application for Immigrant Visa and Alien Registration. Upon arrival in the United States, Cao would receive conditional permanent residence. Alternatively, if Cao (or, in this case, here son) was in the United States, she could apply for an immigrant visa by filing a Form I-485 petition.

72. Plaintiff notes that at or around the time that her I-526 petition was approved, the USCIS was phasing out Form DS-230 and replacing it with Form DS-260.

73. If Cao received conditional permanent residency, she would have to file an I-829 petition within the 90 day period immediately preceding the second anniversary of her admission to the United States. If the I-829 petition were then granted, Cao would be eligible to receive a ten-year green card, renewable indefinitely.

74. However, to this date, Wang is still not eligible to file an I-485 petition, and her son is not able to file an I-485, DS-230 or DS-260 petition.

75. In this case, Wang turned 21 on February 18, 2015.

76. Wang turned 21 ten months and five days after Associates filed the I-526 petition, i.e. before the I-526 petition was approved in June, 2015.

77. However, as is set forth below, under a law known as the Child Status Protect Act, United States law provides a formula designed to protect children's eligibility and to preserve family unity.

78. In sum and substance, when an immigrant visa is unavailable because demand for the visas in the preference category exceeds the annual limit, or cap (10,000 total visas for category EB-5), there is a backlog. In the event of a backlog, the immigrant visa petition (the I-526 in the case of EB-5) will be assigned a "priority date" corresponding to the date the petition was received by USCIS. This date establishes

the applicant's place in the green card waiting line. When the applicant's priority date becomes "current," meaning that visa numbers are available for applicants whose petitions were filed before the cut-off date for the visa category, then the applicant can be issued an immigrant visa, either at a consulate or embassy abroad, or through approval of an application for adjustment of status (I-485) if in the United States.

79. At the time that Zhou filed the I-526 petition, there were over six thousand pending I-526 petitions.

80. There is a limit of 10,000 EB-5 visas per year. However, only seven percent can go to nationals of any one country. Thus, there is a limit of 700 such visas for Chinese nationals (disregarding derivative visas such as for children).

81. Because of the backlog for visa applicants from China, for persons who filed an I-526 at or around when plaintiff filed, namely April 2014 (and thus have a priority date of April 2014, and whose application was approved in June 2015, the priority date is still, to this date, over eighteen months later, not current.

82. In sum and substance, under the CSPA and other applicable law, given that the I-526 was approved approximately 14 months after filing, Wang will have aged out if his priority date of April 13, 2014 did not become current by approximately April, 2016.

83. In fact, the priority date of April 13, 2014 still has not become current. Therefore, Wang is not eligible for derivative benefits and cannot obtain an EB-5 visa through his mother.

84.  In the PPM, NYC Fund stated at page 36 thereof that as of October 9, 2013, "the General Partner [i.e. NYC Metro, the president of which is Zhou] has been advised that the USCIS is taking approximately thirteen (13) months to approve (or deny) an I-526 Petition."

85. The PPM did not state, however, anything about priority dates, how or when or the process by which priority dates become current, or the significance of priority dates.

86. The retainer agreement did not mention anything about priority dates, how or when or the process by which priority dates become current, or the significance of priority dates. Nor did it mention anything about backlogs, or the fact that there are limits on the number of EB-5 visas that can be issued, and that can be issued for Chinese nationals in particular.

87. In 2014, Zhou even posted on his website an article from the Chinese language newspaper World Journal, entitled "Chinese used up EB-5 Investors Visa Limit First Time In History" for stating that USCIS had used up its limit on EB-5 visas for Chinese nationals in 2014.

88. Zhou held himself out at all times as an expert in immigration law, including, and especially, with respect to the EB-5 program.

89. As a purported expert in immigration law, Zhou knew, or by the exercise of due diligence should have known, that the likelihood Cao would have been able to obtain a green card for Wang was unlikely, given the significance of:

a) priority dates;

b) how or when or the process by which priority dates become current;

c) backlogs;

e) the limits on the number of EB-5 visas that can be issued, and that can be issued for Chinese nationals in particular.

90. Zhou also did not advise Cao with respect to the option of Wang applying for an EB-5 Investor visa, and ultimately a green card, on his own, and not derivatively through his mother.

91. If Wang had applied on his own, there would not have been a problem of his aging out by virtue of reaching age 21 (for CSPA purposes).

92. As a result of Zhou's failure to adequately advise and warn Cao of the fact that it was unlikely that her I-526 petition would be approved prior to the date that Wang turned 21 for CSPA purposes, Cao suffered damage.

93. To date, Cao has received no return on her investment in NYC Fund, including the one percent preferred return provided for in the private placement memorandum and other offering materials.

94. Cao's damages include the legal fees paid to Associates, the subscription fee of $500,000, the administrative and legal fees of $94,235 and other damages to be determined at trial.

95. Zhou and Associates failed to exercise the care, skill and diligence commonly possessed and exercised by a member of the legal profession.

96. But for the negligence of Zhou and Associates, Cao would not have sustained any damages.

97. By reason of the foregoing, plaintiff has been damaged in an amount to be determined at trial, but in no event less than $594,235.

<u>AS AND FOR A SECOND CAUSE OF ACTION</u>

98. Plaintiff repeats and realleges paragraphs 1 through 97 hereof as if more fully set forth herein.

99. Zhou and Associates represented to Cao that Zhou was an expert in United States immigration and EB-5 program law.

100. Zhou represented to Cao and Yongning that there would be no problem with Wang being able to obtain a green card through the EB-5 program and in connection with Cao's investment

in the Hotel Project and that they should not have any worry or fear about Wang being able to receive a green card.

101. Zhou and Associates knew, or should have known, that their representations were false or made with reckless disregard of their falsity.

102. As attorney, Zhou and Associates owed fiduciary, legal and ethical duties to Cao to disclose in his retainer agreement, but failed to disclose, that in addition to acting as attorney for NYC Metro, he would receive fees and compensation from the following sources:

i. $94,235 "Administrative" or "Processing" and legal fees fee that Cao,  would be required to pay, along with such fees by other investors;

ii. One percent fee of the full amount of the loan made by NYC Fund for the Project;

iii. Annual fee of up to one percent per annum on the amount of the loan; and

iv. Pursuant to the Private Placement Memorandum, "all net income of the Partnership in excess of the Limited Partner's Preferred Return and unrecovered Capital Contributions. As a result, assuming a successful close of the Offering, the General Partner stands to earn a "spread" (the difference between the interest charged on the Partnership Loan and the Preferred Return paid to the Investors by the Partnership"; and

v.   Three percent of the outstanding principal amount of
the loan contributed by EB-5 investors, up to a maximum of 20
total EB-5 investors.

103. Zhou and Associates failed to disclose their conflicts
of interest for the purpose of maximizing their own monetary
compensation.

104. Zhou and Associates made the foregoing representations
with the intention that Cao would rely on them.

105. Zhou and Associates knew, or were reckless or
negligent in not knowing, that his and NYC Metro's receipt of
fees and commission was not disclosed to Cao.

106. That information, had it been disclosed in Zhou's
retainer agreement, would have been significant information to
Cao, as it would have affected her assessment of Zhou's claimed
objectivity and due diligence in recommending the Hotel Project
to her.

107. That information would also have affected Cao's
understanding and belief that Zhou, as her legal representative
and a licensed attorney, was free of any undisclosed conflict of
interest in his dealings with her.

108. The information regarding fees and commissions to Zhou
and NYC Metro, had it been disclosed, would have affected Cao's
understanding of the overall terms, conditions, risks and costs
associated with the EB-5 investment, and would have been

significant information to her in deciding whether to proceed with the EB-5 investment that Zhou recommended.

109. Cao relied on the representations to her detriment.

110. By reason of the foregoing, Cao suffered damages.

111. By reason of the foregoing, Cao suffered damages in an amount to be determined at trial, but in no event less than $594,235.

### AS AND FOR A THIRD CAUSE OF ACTION

112. Plaintiff repeats and realleges paragraphs 1 through 111 hereof as if more fully set forth herein.

113. As an attorney and law firm representing Cao, Zhou and Associates had a fiduciary obligation to deal honestly, fairly, equitably and in good faith toward Cao.

114. As the President of the general partner of NYC Fund, Zhou had a fiduciary obligation to deal honestly, fairly, equitably and in good faith toward Cao.

115. As general partner of NYC Fund, NYC Metro had a fiduciary obligation to deal honestly, fairly, equitably and in good faith toward Cao.

116. NYC Fund has a fiduciary obligation to deal honestly, fairly, equitably and in good faith toward Cao.

117. Zhou did not disclose in his retainer agreement that he was acting as President of NYC Metro.

118. Zhou did not disclose in his retainer agreement that in addition to acting as attorney for NYC Metro, he would receive fees and compensation from the following sources:

i. $94,235 "Administrative" or "Processing" and legal fees fee that Cao,  would be required to pay, along with such fees by other investors;

ii. One percent fee of the full amount of the loan made by NYC Fund for the Project;

iii. Annual fee of up to one percent per annum on the amount of the loan;

iv. Pursuant to the Private Placement Memorandum, "all net income of the Partnership in excess of the Limited Partner's Preferred Return and unrecovered Capital Contributions. As a result, assuming a successful close of the Offering, the General Partner stands to earn a "spread" (the difference between the interest charged on the Partnership Loan and the Preferred Return paid to the Investors by the Partnership"; and

v.   Three percent of the outstanding principal amount of the loan contributed by EB-5 investors, up to a maximum of 20 total EB-5 investors.

119. Zhou disseminated marketing materials that stated that the EB-5 fund is secured by dual mortgages.

120. In fact, the Private Placement Memorandum states that NYC Fund's loan for the Indigo Hotel is secured by the developer's equity interest.

121. In fact, the loan for the Indigo Hotel is not secured by a mortgage.

122. In fact, the security for the loan for the Indigo Hotel is less valuable and weaker than a mortgage on the underlying land and building. Zhou and Associates knew, or were reckless or negligent in not knowing, that his and NYC Metro's receipt of fees and commission was not disclosed to Cao.

123. The information regarding fees and commissions that Zhou and NYC Metro stood to earn, over and above legal fees charged to Cao and as attorney for NYC Metro, had it been disclosed in Zhou's retainer agreement, would have been significant information to Cao, as it would have affected her assessment of Zhou's claimed objectivity and due diligence in recommending the Hotel Project to her.

124. That information would also have affected Cao's understanding and belief that Zhou, as her legal representative and a licensed attorney, was free of any undisclosed conflict of interest in his dealings with her.

125. The information regarding fees and commissions to Zhou and NYC Metro, had it been disclosed, would have affected Cao's understanding of the overall terms, conditions, risks and costs

associated with the EB-5 investment, and would have been significant information to her in deciding whether to proceed with the EB-5 investment that Zhou recommended.

126. By reason of the foregoing, defendants breached their fiduciary duty to plaintiff.

127. By reason of the foregoing, plaintiff has suffered damages in an amount to be determined at trial, but in no event less than $594,235.

### AS AND FOR A FOURTH CAUSE OF ACTION

128. Plaintiff repeats and realleges paragraphs 1 through 127 hereof as if more fully set forth herein.

129. By reason of the foregoing, the Court should grant rescission of the subscription agreement and limited partnership agreement with respect to plaintiff's interest therein.

### AS AND FOR A FIFTH CAUSE OF ACTION

130. Plaintiff repeats and realleges paragraphs 1 through 129 hereof as if more fully set forth herein.

131. Page 1 of the Private Placement Memorandum refers to the limited partnership interests as "Securities."

132. Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

(i) with scienter, employed devices, schemes, or artifices to defraud;

(ii) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

133. By engaging in the conduct described above, defendants violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. §77 q(a).

134. By reason of the foregoing, defendants have been damaged in an amount to be determined at trial, but in no event less than $594,235.

<u>AS AND FOR A SIXTH CAUSE OF ACTION</u>

135. Plaintiff repeats and realleges paragraphs 1 through 134 hereof as if more fully set forth herein.

136. Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instruments of interstate commerce or by use of the mails, with scienter:

(i) employed devices, schemes, or artifices to defraud;

(ii) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

137. By engaging in the conduct described above, defendants violated Section 10(b) of the Securities Act of 1933, 15 U.S.C. 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

138. By reason of the foregoing, defendants have been damaged in an amount to be determined at trial, but in no event less than $594,235.

### AS AND FOR A SEVENTH CAUSE OF ACTION

139. Plaintiff repeats and realleges paragraphs 1 through 138 hereof as if more fully set forth herein.

140. As General Partner of NYC Fund and pursuant to the terms of the limited partnership agreement, the New York Partnership Law and any applicable common law, NYC Metro owes a fiduciary duty to plaintiff.

141. Plaintiff has requested true and accurate information regarding the financial affairs of NYC Fund and the value of her membership interest.

142. NYC Metro has refused to provide such information.

143. Plaintiff has no adequate remedy at law.

144. Plaintiff is entitled to an accounting to determine the value of her membership interest, the propriety of distributions made or not made to plaintiff, the existence of self-dealing, the propriety of payments made by NYC Metro to Zhou and/or other entities controlled by or affiliated with Zhou and the accuracy of NYC Fund's financial statements.

WHEREFORE, plaintiff Quling Cao demands judgment as follows:

A. On the first cause of action, against defendants Joe Zhenghong Zhou and the Law Offices of Joe Zhenghong Zhou and Associates, PLLC, jointly and severally, damages in an amount to be determined at trial, but in no event less than $564,235;

B. On the second cause of action, against defendants Joe Zhenghong Zhou and the Law Offices of Joe Zhenghong Zhou and Associates, PLLC, jointly and severally, damages in an amount to be determined at trial, but in no event less than $560,000;

C. On the third cause of action, against defendants Joe Zhenghong Zhou, the Law Offices of Joe Zhenghong Zhou and Associates, PLLC, NYC Metro Regional Center LLC and NYC Fund LP, jointly and severally, damages in an amount to be determined at trial, but in no event less than $594,235;

D. On the fourth cause of action, against defendants Joe Zhenghong Zhou, NYC Metro Regional Center LLC and NYC Fund LP,

granting rescission of the subscription agreement and limited partnership agreement with respect to plaintiff's interest therein;

E. On the fifth cause of action, against defendants Joe Zhenghong Zhou, the Law Offices of Joe Zhenghong Zhou and Associates, PLLC, NYC Metro Regional Center LLC and NYC Fund LP, jointly and severally, damages in an amount to be determined at trial, but in no event less than $594,235;

F. On the sixth cause of action, against defendants Joe Zhenghong Zhou, the Law Offices of Joe Zhenghong Zhou and Associates, PLLC, NYC Metro Regional Center LLC and NYC Fund LP, jointly and severally, damages in an amount to be determined at trial, but in no event less than $594,235;

G. On the seventh cause of action, against defendants Joe Zhenghong Zhou, the Law Offices of Joe Zhenghong Zhou and Associates, PLLC, NYC Metro Regional Center LLC and NYC Fund LP, judgment ordering an immediate accounting and judgment against all defendants in an amount to be determined at such accounting;

H. Interest, costs and disbursements of this action;

I. Legal fees; and

J. Such other and further relief as the Court shall deem just and proper.

Dated: New York, New York
      November 27, 2016

Yours, etc.,

MOSS & KALISH, PLLC

By: _____

David B. Gelfarb
Gelfarb@mosskalish.com
Attorneys for Plaintiff
122 E. 42nd Street Ste. 2100
New York, New York 10168
(212) 867-4488

## JURY DEMAND

Plaintiff demands trial by jury of all claims triable by jury.

Dated: New York, New York
       November 27, 2016

Yours, etc.,

MOSS & KALISH, PLLC

By: _____

David B. Gelfarb
Gelfarb@mosskalish.com
Attorneys for Plaintiff
122 E. 42nd Street Ste. 2100
New York, New York 10168
(212) 867-4488